# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAW TECHNOLOGIES INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. |
| | ) |
| BROOKE HERNANDEZ and | ) **JURY TRIAL DEMANDED** |
| PROBROKER LLC | ) |
| | ) |
| Defendants. | ) |
| | ) |

## VERIFIED COMPLAINT

Plaintiff Saw Technologies Inc. ("Saw.com"), by its attorneys Epstein Becker & Green, P.C., brings this action against Defendants Brooke Hernandez and ProBroker LLC for preliminary and permanent injunctive relief, specific performance, and damages, and states as follows:

## NATURE OF THIS ACTION

1.     This is an action for injunctive relief and damages for Defendants' willful, knowing, and malicious violations of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*, the Stored Communications Act, 18 U.S.C. § 2701, *et seq.*, and false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as well as breach of contract and tortious interference with business relations.

2.      Saw.com is a domain brokerage firm that facilitates the purchase and sale of website domains and other digital properties. Saw.com represents buyers seeking to acquire specific domain names and sellers looking to divest them. Much like RE/MAX or Century 21 in commercial or residential real estate, where buyers and sellers hire dedicated brokers to represent their interests, Saw.com provides the same specialized representation in the domain market.

3.      Given the variables of these transactions, with domain prices ranging from hundreds of dollars to more than $10 million, as well as the vital importance of relationships with those controlling domain portfolios, domain brokerages like Saw.com must safeguard their confidential and proprietary information including customer lists, leads, inventory, proposals, contracts, domain registrant information, communications, offers, pricing information, and financial data, to provide a commercial advantage.

4.      Ms. Hernandez was a domain broker who worked as an independent contractor for Saw.com before departing on October 29, 2025.

5.      Prior to working with Saw.com, Ms. Hernandez worked closely with Saw.com's founder and Chief Executive Officer, Jeffrey Gabriel, for approximately nine years at other domain brokerages and joined him in December 2019 after he formed Saw.com, where they worked together for another five years until her departure in October 2025.

6.      In her role as a domain broker, entrusted Ms. Hernandez with maintaining, developing, and fulfilling Saw.com's customer relationships and executing domain-related transactions on behalf of Saw.com.

7.      Ms. Hernandez's relationship with Saw.com was governed by a Consulting Agreement made as of December 23, 2019, by and between Ms. Hernandez and J. Matthew Inc., Saw.com's predecessor-in-interest (the "Agreement").

8.      Pursuant to the Agreement, Ms. Hernandez agreed, for a period of six months following the conclusion of the parties' contractual relationship (the "Restricted Period") not to solicit, directly or indirectly, any customer or prospective lead with whom Ms. Hernandez did not have an existing relationship prior to executing the Agreement.

9.     The Agreement also required Ms. Hernandez to maintain the confidentiality of Saw.com's proprietary information and only use such information for Saw.com's benefit. This proprietary information included, without limitation, leads, inventory, proposals, contracts, domain registrant information, communications, offers, pricing information, financial data, and other confidential information used by Saw.com in the course of its business from which Saw.com derives commercial advantage ("Proprietary Information").

10.     The Agreement required Ms. Hernandez to return all Saw.com property, including Proprietary Information, to Saw.com and to retain no copies, backups, or portions thereof, and to temporarily provide, at Saw.com's request, equipment Ms. Hernandez used in the conduct of Saw.com's business or upon which Proprietary Information was stored, for inspection and deletion of Saw.com's Proprietary Information.

11.     Despite Ms. Hernandez's obligations to refrain from soliciting Saw.com's customers and prospects for this limited window, in the weeks following the termination of her relationship with Saw.com—and in fact in the weeks leading up to her separation from the company—Ms. Hernandez began a surreptitious scheme to divert Saw.com's customer relationships and pilfer Saw.com's Proprietary Information.

12.     Saw.com recently learned that Ms. Hernandez launched a directly competing business, ProBroker LLC, and is now offering identical services on behalf of ProBroker that she performed while working with Saw.com.

13.     But Ms. Hernandez has been building ProBroker on the back of Saw.com. She has improperly solicited Saw.com's customers and prospects, surreptitiously diverted opportunities and relationships provided to her by Saw.com, and illegally utilized Saw.com's Proprietary Information, all in direct violation of the Agreement.

14.     Specifically, almost immediately upon deciding to separate from Saw.com, Ms. Hernandez began exploiting her access to Saw.com's customers, prospects, inventory, deal information, and other Proprietary Information to capitalize on Saw.com's customer relationships and Proprietary Information for her own benefit and for the benefit of ProBroker, while attempting to evade detection by deleting incriminating or other useful communications from her Saw.com-provided email account.

15.     Publicly, Ms. Hernandez misrepresented her separation from Saw.com to attempt to lure Saw.com's unwitting customers to ProBroker without revealing the nature of her actions; customers who did not realize their business had been transferred away from Saw.com to ProBroker.

16.     ProBroker has begun falsely representing itself to the market as responsible for noteworthy domain transactions that were entered into solely as a product of Saw.com's customer relationships and investments in those relationships.

17.     Ms. Hernandez, individually and in concert with ProBroker, misappropriated Saw.com's trade secrets, violated the Stored Communications Act, engaged in false advertising in violation of the Lanham Act, breached her Agreement with Saw.com, and tortiously interfered with Saw.com's business relationships.

18.     Defendants' purposeful and strategic diversion of Saw.com's customer relationships disrupted business opportunities and goodwill that properly belonged to Saw.com, and for that, the Defendants must be held responsible.

19.     Despite demanding that Ms. Hernandez and ProBroker cease and desist any further conduct in violation of the Agreement and law, and that Defendants return all devices or equipment Ms. Hernandez used in the conduct of Saw.com business or upon which Proprietary Information

was stored, for inspection and deletion of Saw.com's Proprietary Information in accordance with the Agreement, Ms. Hernandez has abjectly refused to do so. Saw.com therefore brings this action to enjoin Ms. Hernandez's illegal conduct and recover monetary damages that have already been caused by Ms. Hernandez's actions.

## PARTIES

20.     Saw.com is a corporation organized under the laws of the State of Florida with its principal place of business located at 1655 East Semoran Blvd., Suite 22, Apopka, Florida 32703. Saw.com is the successor in interest to J. Matthew Inc., a now defunct Massachusetts corporation with a principal place of business at 37 South Street, Northborough, Massachusetts.

21.     Ms. Hernandez is a citizen of the State of Florida residing at her last known address of 4429 Saxon Drive, New Smyrna Beach, Florida 32169.

22.     ProBroker is a corporation organized under the laws of the State of Florida with its principal place of business located at 4429 Saxon Drive, New Smyrna Beach, Florida 32169. Upon Information and belief, Brooke Hernandez is the sole member of ProBroker LLC.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the matter arises out of federal law.

24.     This Court has supplemental jurisdiction over Saw.com's state law claims as these claims are part of the same case or controversy that forms the basis of Saw.com's federal law claim.

25.     This Court has personal jurisdiction over Defendants because, among other things, Ms. Hernandez, ProBroker's sole owner and employee, and its alter-ego, entered into a contract with an entity located in Massachusetts and agreed that "[a]ny dispute arising under [her]

Agreement shall be brought exclusively in the courts of Massachusetts…" Further, upon information and belief, all Defendants transact business in the Commonwealth of Massachusetts and derive revenue from services rendered to customers in the Commonwealth of Massachusetts.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants regularly transact business in this District.

**FACTS**

**A. Saw.com Engages Brooke Hernandez as an Independent Contractor and Executes the Consulting Agreement**

27.     In or about 2019, Jeffrey Gabriel, a world-renowned domain broker with over $565 million in sales over the span of his career, founded and built Saw.com based on his extensive experience, reputation, and network of customers and referral sources in the domain industry.

28.     Saw.com, a domain brokerage firm, functions as a brokerage for digital properties, representing and connecting buyers seeking to acquire specific domain names and sellers looking to divest them.

29.     Saw.com further leverages its expertise in the domain industry to provide its customers with crucial domain brokerage, appraisal, protection, and portfolio management services.

30.     To enhance the operations of his newly formed business, Mr. Gabriel engaged his longtime colleague, Ms. Hernandez, to work for Saw.com as an independent contractor of the start-up venture.

31.     Ms. Hernandez and Mr. Gabriel first began working together in 2011, and Ms. Hernandez followed Mr. Gabriel to a second company in 2013 before ultimately following him to Saw.com in 2019.

32. On December 23, 2019, Ms. Hernandez entered into the Agreement with J. Matthew Inc., a now defunct Massachusetts corporation with a principal place of business at 37 South Street, Northborough, Massachusetts, entitling her to receive commissions and other benefits in connection with her performance of services as an independent contractor of Saw.com. A copy of the Agreement is attached as **Exhibit A**.

33. On January 1, 2022, Saw.com Inc. acquired all rights, assets, agreements, and good will of J. Matthew Inc. in connection with a transaction authorized by the shareholders of J. Matthew Inc. on December 20, 2021, and assumed J. Matthew Inc.'s rights and obligations under the Agreement. In an asset purchase agreement dated May 23, 2023, Saw Technologies Inc. acquired all assets of Saw.com Inc. and assumed all rights and obligations under the Agreement. In other words, through a series of corporate transactions, Saw.com stepped into the shoes of J. Matthew Inc. with respect to the Agreement, among other things.

34. As an independent contractor of Saw.com, Ms. Hernandez was provided substantial confidential information about Saw.com's offerings including Saw.com's customers, leads, inventory, proposals, contracts, domain registrant information, contact information, communications, offers, pricing information, and financial data, among other things.

35. Ms. Hernandez was entrusted with access to Saw.com's various databases and other tools and accounts, including: Close.com, Saw.com's customer relationship management ("CRM") database where all communications, lead history, and transaction records are stored; Calendly, Saw.com's scheduling platform that allows external parties to book meetings directly; and DomainIQ, a paid service used to research domain ownership, contact information, and historical pricing and other data, similar to a registry of deeds for real property.

36.     Ms. Hernandez's access to and use of these accounts gave her significant access to Saw.com's Proprietary Information, so, naturally, she was required to comport with Saw.com's policies and procedures, including an obligation to secure, backup, and refrain from deleting correspondence with customers and prospects and logging all interactions in Saw.com's accounts.

37.     At the time Ms. Hernandez began performing services for Saw.com, she relied, in large part, on the customers and connections of Mr. Gabriel and Saw.com to perform her brokerage services. Rather than generate her own customers, the vast majority of Ms. Hernandez's sales were existing Saw.com customers or prospects, or transactions Ms. Hernandez was assigned to service, maintain, and/or execute upon – customers, prospects, and transactions that Saw.com had identified, researched, and secured for Ms. Hernandez and other contractors to service, maintain, and execute upon.

38.     In these relationships, Ms. Hernandez managed Saw.com's established relationships and goodwill, maintained communication with Saw.com's customers, facilitated negotiations and transactions, and promoted product offerings with established customers and prospective customers of Saw.com.

39.     At the time of her voluntary resignation in October 2025, Ms. Hernandez was overseeing, involved with, or was responsible for more than 46,000 leads and 90,000 contacts, and had non-public information concerning approximately 360,000 leads and 620,000 contacts in Saw.com's pipeline, as well as highly confidential and commercially sensitive information relevant to Saw's customers and both completed and pending transactions, including the deal prices, offers, valuations, and appraisals of various domains and domain portfolios, all of which Saw.com maintains as confidential and makes accessible only to those with a genuine need to

know who are subject to contractual obligations restricting their use or disclosure of such Proprietary Information outside of Saw.com.

40.     Ms. Hernandez did not independently generate relationships with the overwhelming majority of the customers with whom she engaged, rather, she tended to them on Saw.com's behalf, using Saw.com's resources, while being compensated by Saw.com.

41.     Saw.com's relationships, networking, and marketing prowess served as the foundation of Ms. Hernandez's knowledge and connection in the domain brokerage industry over the past five years. For instance, of the nearly 300 sales Ms. Hernandez stewarded while working with Saw.com, fewer than 10 were created without use or reliance on Saw.com's confidential Proprietary Information.

**B.  Ms. Hernandez's Agreement with Saw.com**

42.     As a condition of her engagement with Saw.com, Ms. Hernandez agreed to a number of limited yet crucial obligations designed to protect Saw.com's substantial investment in its customer relationships, leads, and pipeline, as well as Saw.com's Proprietary Information.

43.     Specifically, Section 7 of the Agreement provides:

Either Party may terminate this Agreement by giving notice of intent to [terminate] thirty days prior to the effective date of termination.

Upon termination of this Agreement Consultant shall return any company property in Consultant's possession, and continue [to] comply with the confidentiality provisions stated below and shall, for a period of six months, refrain from directly or indirectly soliciting any customer or prospective lead of the Company with whom Consultant did not have an existing relationship prior to this Agreement.

44.     In Section 9 of the Agreement, Ms. Hernandez agreed that:

Consultant understands that during the course of preforming this Agreement, Consultant will obtain and utilize Proprietary Information of the Company. Such Proprietary Information shall include, without limitation, sale and purchase prospects, leads, inventory, proposals, contracts, domain registrant information, communications, offers, pricing information, financial data and other data which would reasonably be understood to information of value possessed, generated and

used by company in the course of conducting its business and from which the Company derives commercial advantage.

Consultant shall maintain such proprietary information as Company may direct exclusively on Company equipment….

Consultant understands and agrees that unauthorized disclosure of Proprietary Information shall cause irreparable damage to the Company. Upon termination of this Agreement, the Consultant shall return all Company property to the company and shall retain no copies, backups or portions thereof on any media, network storage system, or any other device or system which consultant owns or to which Consultant has access. Consultant shall, upon request of the company and at Company's expense, temporarily provide any equipment which Consultant has used in the conduct of company business or upon which Proprietary information has been stored for inspection by a third party technical services provider to confirm deletion of company's Proprietary Information from such equipment. Consultant also agrees to not solicit any Company Contractors or Employees (or any that have left in the last 90 days) for a period of 90 days from termination.

### C. Ms. Hernandez's Declining Performance and Pre-Resignation Misconduct

45.     After years of a profitable and mutually advantageous arrangement, Mr. Gabriel noticed a shift in Ms. Hernandez's performance and demeanor.

46.     At first, Mr. Gabriel observed Ms. Hernandez's declining performance, evidenced by fewer sales, lower dollar volume, unresponsiveness, missed meetings, and a general lack of engagement or professionalism in her work.

47.     Ms. Hernandez's conduct grew increasingly abnormal, as she inexplicably worked to push other Saw.com representatives out of transactions in order to secure a greater commission for herself, and reported an eight-fold decline in transactions accomplished through referrals, a valuable metric given the critical role such referrals from existing customers and domain portfolio holders plan in the industry,

48.     In or about 2025, Ms. Hernandez began concealing transaction details from Saw.com, including the referral sources for certain transactions and referral fees paid to third-parties.

49. On information and belief, Ms. Hernandez also began closing on other transactions she diverted from Saw.com by soliciting Saw.com customers or prospects.

50. In or around September 2025, Mr. Gabriel became aware of other increasingly erratic and inexplicable behavior on Ms. Hernandez's part; for example, Ms. Hernandez registered for NamesCon, a domain name industry convention, and made arrangements to attend separate from Saw.com, despite knowing that Saw.com had already purchased a ticket for her, and despite previously representing to Saw.com that she would attend the convention as a contractor of Saw.com, going as far as ordering a Saw.com-branded shirt for wearing at the convention.

51. When confronted with her abnormal behavior, Ms. Hernandez said that she wished to terminate the Agreement, but still wanted to attend the NamesCon conference.

52. Mr. Gabriel requested that Ms. Hernandez refrain from attending the conference to avoid the risk of confusing customers and prospective customers during the Restricted Period, and offered to compensate her for the ticket she paid for.

53. Despite initially agreeing with this request, a day later, Ms. Hernandez retracted and indicated her intention to attend.

54. At that time, Mr. Gabriel reminded Ms. Hernandez of the Agreement and the post-termination covenants contained therein, and sent her a copy of the Agreement for reference.

55. Ms. Hernandez confirmed in writing that she "will adhere strictly to the agreement and uphold the integrity of Saw.com, never saying or doing anything that could diminish or devalue the company. I've always represented Saw.com with professionalism and will continue to do so during this transition."

56. At the NamesCon conference, however, Ms. Hernandez worked to market her entry to the domain brokerage market separate from Saw.com, approached customers of Saw.com and

offered her domain brokerage services in an attempt to solicit their business during the Restricted Period, and scheduled meetings with prospective customers, including existing Saw.com customers.

57.     Prior to the conference, Ms. Hernandez scheduled a meeting with a customer introduced to her by Saw.com, but concealed this meeting from Saw.com. On or about August 14, 2025, Ms. Hernandez clandestinly removed this customer from Saw.com's marketing mailing lists so that he would no longer receive communications from Saw.com.

58.     Other evidence demonstrated that Ms. Hernandez had been planning to leave Saw.com and compete directly with it for weeks, if not months before providing her notice.

59.     Specifically, In or about July 2025, Mr. Gabriel's wife overheard Ms. Hernandez's friends inquiring whether she had "quit [her] job yet."

60.     On or before September 17, 2025, Ms. Hernandez changed her email signature block to remove all Saw.com information, leaving only her personal cellphone number; in the 45 days leading up to her resignation, Ms. Hernandez sent nearly 1,000 emails to customers that included only her personal phone number and not Saw.com's contact information.

61.     On the day she resigned, moreover, Ms. Hernandez emailed 39 Saw.com customers using her modified signature, inquired if they intended to purchase any domains, and directed all communication to her personal phone.

62.     Saw.com learned that Ms. Hernandez had, inexplicably, begun using two separate DomainIQ accounts – one provided and paid for by Saw.com, and another redundant account she maintained at her own expense. Upon information and belief, prior to her resignation, Ms. Hernandez canceled her personal DomainIQ account; by doing so, she erased search history shielding vital information about transactions she had been concealing and diverting from Saw.com.

63. In contrast with standard or accepted practices expected from Saw.com's contractors, moreover, Ms. Hernandez utilized separate, private accounts for executing contracts with customers, like DocuSign and potentially others, which, upon information and belief, Ms. Hernandez used to conceal transactions she was diverting from Saw.com, even though these transactions involved Saw.com's customers.

64. Further, Ms. Hernandez inexplicably connected her Saw.com-provided email account to an unauthorized third-party AI-powered application, exposing Saw.com's communication and Proprietary Information to potential proliferation and misuse. Upon information and belief, Ms. Hernandez retained copies of Saw.com's customer list and other Proprietary Information in this AI application.

65. In the weeks leading up to the end of her engagement, Ms. Hernandez deleted email communications with Saw.com leads, activity logs, and call logs, and on her final two days before terminating the Agreement, exported data from Saw.com's systems and deleted further call logs, contact information, and email activity.

66. Throughout her engagement with Saw.com, unbeknownst to Mr. Gabriel, Ms. Hernandez stored Saw.com's Proprietary Information on her personal computer and has refused to return such equipment to Saw.com upon her resignation such that Saw.com could confirm that its Proprietary Information was secure and to remove it from her custody and control.

**D. Ms. Hernandez's Resignation and Revelation of the Extent of her Misconduct**

67. Effective October 29, 2025, Ms. Hernandez terminated the Agreement, ending her engagement with Saw.com and initiating a six month prohibition against soliciting Saw.com's customers or prospects.

68. In the wake of her resignation, Saw.com has conducted an investigation analyzing Ms. Hernandez's access to and use of her Saw.com email account, Saw.com's CRM database, and

its Calendly account, and uncovered misconduct that Ms. Hernandez concealed from Saw.com in the months leading up to her resignation.

69. Specifically, Saw.com's investigation uncovered Ms. Hernandez's deletion of email correspondence from Saw.com's systems, as well as deletion of leads and other company CRM data from Saw.com's databases, in the weeks and months leading to her resignation.

70. Further, an analysis of Ms. Hernandez's Calendly data revealed that she had concealed meetings with Saw.com's customers and prospects but failed to provide relevant transaction details to Saw.com.

71. In addition to her misuse, destruction, and obfuscation of Saw.com's electronic communications and other information, Ms. Hernandez leveraged her access to Saw.com's customers and prospects, and its other Proprietary Information, to divert transactions from Saw.com for her own personal benefit and to conceal these transactions. Upon information and belief, Ms. Hernandez did this to avoid sharing commissions or remitting payments owed to Saw.com, and to further conceal her ultimate aim of launching her own competing business, ProBroker.

72. For example, Ms. Hernandez misled Saw.com into believing a transaction for the domain "Gong.com" in which Saw.com was representing the seller had been cancelled by a prospective buyer, only to learn that Ms. Hernandez remained in contact with Saw.com's customer and the prospective buyer for the purpose of orchestrating a sale following her departure. Ms. Hernandez deleted emails and failed to enter lead information into Saw.com's CRM to conceal her diversion of the transaction.

73. In another nefarious act, on or about October 24, 2025, a buyer for the domain "Altitude.com" provided Ms. Hernandez with the buyer's address so that she could send a Buyer

Broker Representation Agreement, but Ms. Hernandez never prepared an agreement between Saw.com and this buyer or saved such agreement to Saw.com's CRM system, indicating that Ms. Hernandez may have executed this agreement and proceeded with the transaction outside of the agreed-upon workflow to conceal it from Saw.com to avoid remitting payment owed to Saw.

74.    Upon information and belief, Ms. Hernandez contacted customers of Saw.com after terminating the Agreement, many of whom she had never spoken or worked with before, for the purposes of soliciting their business. For example, on December 30, 2025, Ms. Hernandez attempted to solicit a Saw.com customer for purposes of offering domains for sale by another entity. Ms. Hernandez would not have reason to have this individual's phone number absent misappropriation:



75.     In or about January 2026, Ms. Hernandez formally announced the launch of ProBroker, a competing domain brokerage business.

76.     An industry publication said the quite part out loud: "The launch of ProBroker.com is no longer a secret, something that was in plan since NamesCon 2025 in Miami, Florida,"[1] which, as discussed above, occurred just days after Ms. Hernandez's resignation.

77.     Further highlighting Ms. Hernandez's efforts to draft off the success of Saw.com, ProBroker's website falsely touts "its" successes, including acquiring gate.com, hosting.com, spill.com, diamond.com, jumba.com, easylaser.co.uk, manifestlaw.com, macromax.com, day.ai, ollie.com, and bunny.com, however, in reality, none of these "successes" can be properly attributed to ProBroker.

78.     ProBroker lists among "Companies We've Worked With"[2] Signature Builders, Pin, and Cow's Milk Protein Allergy – customers offering services in Massachusetts, as well as Macromax, Wellnest, Bookmarked, Innovo, Storyboard, and others, which were customers of Saw.com and cannot be accurately attributed to ProBroker.

79.     ProBroker displays "Testimonials" on its website, implying that these customers worked with ProBroker, when again, in reality, each testimonial was submitted to Saw.com via its Trustpilot review site during Ms. Hernandez's engagement with Saw.com and before ProBroker was formed.

---

[1] https://domaingang.com/domain-news/domain-broker-brooke-hernandez-launches-probroker/ (last accessed Feb. 20, 2026).
[2] https://probroker.com/about-us/ (last accessed Feb. 25, 2026).











80.     Each of these transactions ProBroker highlights for the purposes of showcasing its purported track record for attracting customers were, in fact, transactions procured, facilitated, and brought to fruition by Saw.com; attributing them to ProBroker poses a substantial risk of misleading customers in the market.

81.     Further, several of the domains ProBroker lists for sale on its website are owned by Saw.com customers, indicating that Ms. Hernandez has solicited their business following termination of the Agreement. For example, Holdings.ai is owned by a Saw.com customer that

Ms. Hernandez did not work with prior to her engagement with Saw, yet ProBroker now identifies itself as the broker for "Holdings.ai," indicating that Ms. Hernandez has solicited the domain owner following termination of the Agreement.

82.     With Ms. Hernandez openly contacting Saw.com's customers and competing with Saw.com, ProBroker's use of Ms. Hernandez's intimate knowledge of certain of Saw.com's customers risks inflicting substantial and irreparable harm on Saw.com.

83.     A competitor possessing confidential information about Saw.com's customers, prospects, pricing, negotiation correspondence, and contracting practices places Saw.com in an extremely vulnerable position as ProBroker can easily target each of those customers and take for itself the revenue the customers would otherwise generate for Saw.com, and exploit Saw.com's legwork and investment in building the customer relationships and goodwill, particularly where Ms. Hernandez has eschewed her contractual prohibitions against contacting Saw.com's customers in the short six-month non-solicitation window.

84.     Ms. Hernandez also possesses enough information about Saw.com's customer lists, prospects, and pricing to exploit Saw.com's Proprietary Information for the benefit of her new entity and Saw.com's direct competitor, specifically permitting ProBroker to benefit from the results of Saw.com's market research, customer development, and to use Saw.com's work product, misappropriated from Saw.com at no expense, to unfairly compete against it.

85.     Ms. Hernandez did not cultivate the customer relationships she (and ProBroker) now touts as those that "trust" her, and those she seeks to steal in violation of her Agreement. Rather, Ms. Hernandez serviced a book of business built on Saw.com's investment of time, resources, and funding, and is now attempting to steal it. The goodwill Ms. Hernandez maintained as an independent contractor belonged to Saw.com, as it was generated a result of the utility of

Saw.com's expertise and deep technical knowledge of the domain market, and not because of Ms. Hernandez.

86.     Given the breadth of the confidential customer and prospect information potentially misappropriated by Ms. Hernandez, and the potential threat to Saw.com's goodwill, Saw.com cannot estimate with any degree of certainty the extent of its potential damages to be incurred as a direct consequence of Ms. Hernandez's improper competition and misconduct, and accordingly, the injuries threatened by Ms. Hernandez's misconduct are irreparable.

**E. Saw.com's Reasonable Efforts to Protect its Confidential Information and Trade Secrets**

87.     Saw.com has taken reasonable measures to protect its confidential information and trade secrets, including putting in place policies, procedures, contractual obligations, and technical systems that protect its confidential and proprietary information from disclosure to others and from use by anyone for any purposes other than furthering Saw.com's interests.

88.     Saw.com has a number of practices and policies governing its confidential information, electronic communication, information security, and mobile computing, and each employee and independent contractor performing brokerage services is responsible for using Saw.com's proprietary information, information technology ("IT") resources, and electronic systems consistent with Saw.com's policies and interests.

89.     Saw.com's independent contractors, including Ms. Hernandez, are required to sign or otherwise acknowledge and agree to the Agreement prohibiting these contractors for a period of six months after the termination or cessation of the engagement with Saw.com for any reason, from contacting Saw.com customers for competitive purposes or soliciting Saw.com employees or customers, and indefinitely from using or disclosing any confidential or proprietary information,

including without limitation, customer lists, prospect pipelines, pricing information, or negotiation communications.

90. Saw.com Proprietary Information, as defined in the Agreement, also includes leads, inventory, proposals, contracts, domain registrant information, communications, offers, pricing information, financial data, and other information used by Saw.com in the course of business from which Saw.com derives commercial advantage.

91. Saw.com contractors are required to maintain the confidentiality of all materials or media containing Saw.com's Proprietary Information both during and after engagement with Saw.com, and use such information only in the performance of services for Saw.com.

92. Saw.com contractors are prohibited from copying or removing Saw.com Proprietary Information except in the pursuit of Saw.com business, are required to return all copies of Saw.com's information or property upon their termination, and are prohibited from retaining any Saw.com property or information.

93. Saw.com regularly reminds its contractors of the confidential and proprietary nature of its sales and pricing information by, among other things, requiring workers, including the Ms. Hernandez, to participate in regular trainings concerning Saw.com's IT policies and procedures.

94. Saw.com also restricts access to its computer systems, by, among other things, maintaining advanced computer security systems and requiring the entry of a username and password and two-factor authentication to gain access to Saw.com's computer systems, which includes trade secrets, confidential, and proprietary information.

95.     Further, to the extent that confidential information exists in written paper form, such writings are kept in secured areas with access limited to those who need it for proper business purposes.

96.     Additionally, Saw.com has in place electronic systems that monitor activity such as the downloading of files and information from Saw.com's networks or computers to portable devices, personal e-mail accounts, or to cloud storage services.

## CAUSES OF ACTION

### COUNT I
**Misappropriation of Trade Secrets in Violation of the
Defend Trade Secrets Act, 18 U.S.C. §§ 1836(B)(1), *et. Seq*
(Against All Defendants)**

97.     Saw.com restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

98.     Saw.com has expended considerable resources over several years to discover, amass, and protect certain non-public, highly valuable confidential and proprietary business information and trade secrets, including the identities, preferences, and historical purchase and sale activities of existing and potential customers on both sides of domain-purchase and sale transactions and pricing and valuation information, among other Proprietary Information.

99.     Such information provides Saw.com with a significant competitive advantage over its existing and would-be competitors. This advantage would be lost or materially diminished if this information became known to its competitors. Saw.com's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

100. Saw.com has made reasonable measures to maintain the confidentiality of its proprietary business information and trade secrets, including but not limited to: (a) storing such information in a password-protected computer system; (b) storing certain highly confidential and sensitive information on databases or accounts with additional password protection; (c) limiting access to such information to certain contractors with a need to know; (d) implementing multiple information protection documents and policies, Consulting Agreements, and other confidentiality and information use policies; (e) limiting the use and disclosure of such information; and (f) requiring contractors to return all copies of the information obtained from Saw.com upon termination of employment and subject their equipment to inspection.

101. Ms. Hernandez had knowledge of, access to, and possession of Saw.com's confidential and proprietary business information and trade secrets.

102. By virtue of her contractual obligations, Ms. Hernandez owed Saw.com the duty to refrain from disclosing or exploiting Saw.com's confidential and proprietary business information, customer relationships, property, trade secrets, and know-how for her own benefit, for the benefit of ProBroker or other competitors, or to the detriment of Saw.com.

103. Because of the confidential and proprietary information and trade secrets to which Ms. Hernandez was exposed, had access to, and received knowledge of in her role as a domain broker and because the Ms. Hernandez is currently performing in a similar capacity on behalf of Saw.com's direct competitor, ProBroker, it is inevitable that the Defendants will rely on, draw from, and disclose (and ProBroker will benefit from) the confidential and proprietary information and trade secrets obtained during Ms. Hernandez's engagement with Saw.com and retained after her separation from Saw.com.

104. Upon information and belief, Defendants have actually misappropriated or have threatened to misappropriate Saw.com's trade secrets, as is defined in 18 U.S.C. § 1839(5)(B), including but not limited to customer lists and prospect information, pricing and valuation information, domain inventory, and other Proprietary Information by either disclosing or using such information to or on behalf of ProBroker and potentially other third-parties.

105. The trade secrets that Defendants misappropriated were intended for use and/or were in fact used in interstate commerce.

106. As a direct and proximate result of Defendants' unlawful misappropriation of Saw.com's trade secrets in violation of the DTSA, Saw.com has suffered damages in an amount to be proven at trial.

107. As a direct and proximate result of Defendants' unlawful misappropriation of Saw.com's trade secrets in violation of the DTSA, Defendants have been unjustly enriched in an amount to be determined at trial.

108. As a direct and proximate result of Defendants' unlawful misappropriation of Saw.com's trade secrets, Saw.com has suffered and will continue to suffer irreparable harm if Defendants' misappropriation and use of Saw.com's trade secrets is not enjoined.

109. The misappropriation of Saw.com's trade secrets was done in bad faith and was willful and malicious.

## COUNT II
### Breach of Contract
### (Against Brooke Hernandez)

110. Saw.com restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

111. The Agreements is a valid and enforceable contract.

112.     Ms. Hernandez received consideration for signing and entering into the Agreement, including engagement as an independent contractor of Saw.com, compensation, certain benefits, and access to Saw.com's confidential and proprietary information, among other things.

113.     At all relevant times, Ms. Hernandez has been, and continues to be, bound by the terms of the Agreement.

114.     Ms. Hernandez breached the Agreement by misappropriating and retaining Saw.com's confidential information and trade secrets, soliciting business from Saw.com's customers and prospective customers during the term of the Agreement and within six months following the end of her engagement with Saw.com, taking and using Saw.com property for personal benefit or the benefit of third parties, and intentionally deleting email and other communications and omitting other documentation from Saw.com's CRM and concealing the status of transactions to the detriment of Saw.com, and refusing to provide her computer to Saw.com for ensuring the proper deletion of Saw.com's Proprietary Information.

115.     Upon information and belief, Ms. Hernandez has solicited several of Saw.com's customers to work with her emerging company, ProBroker.

116.     Saw.com performed each and every obligation required of it under the Agreement.

117.     As a direct and proximate result of Ms. Hernandez's breaches of the Agreement, Saw.com has suffered and will continue to suffer damages and irreparable harm.

118.     Saw.com was damaged in an amount to be determined at trial, including but not limited to lost profits from diverted or tarnished customer relationships, costs for remediating customer issues Ms. Hernandez caused, and costs for repairing damage to Saw.com's goodwill and reputation.

119. Injunctive relief is necessary as the recovery of money damages would not fully compensate Saw.com for Ms. Hernandez's breaches of the Agreement.

**COUNT III**
**Unlawful Access to Stored Communications,**
**in Violation of 18 U.S.C. §§ 2701, et seq.**
**(Against Brooke Hernandez)**

120. Saw.com restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

121. Ms. Hernandez knowingly and intentionally accessed, in excess of any authorized access, a facility through which Saw.com's electronic communications are provided and thereby obtained access to such electronic communications while they were in storage in violation of 18 U.S.C. § 2701(a).

122. The Agreement specifically includes "proposals, contracts….communications, offers…." as among Saw.com's "Proprietary Information" and directed Ms. Hernandez to maintain, and not delete, Saw.com's Proprietary Information, including email communications, proposals, offers, and contracts.

123. Under the Agreement, Ms. Hernandez was further obligated to preserve all Saw.com Proprietary Information including email communications and information in Saw.com's CRM, including proposals, contracts, communications, and offers

124. Ms. Hernandez was not authorized to delete Saw.com's Proprietary Information from Saw.com's systems or eqipment, and by deleting such email communications and other Proprietary Information, she exceeded her authorization.

125. Ms. Hernandez knowingly and intentionally prevented Saw.com, the authorized users and owners of the email correspondence, from accessing or using the electronic

communications stored in the Saw.com's email systems and CRM database by deleting Saw.com's communications from its email server and CRM database in violation of 18 U.S.C. § 2701(a).

126. As a direct and proximate result of Ms. Hernandez's violation of 18 U.S.C. §§ 2701, et seq., Saw.com has suffered irreparable harm in the form of damage to its reputation, loss of goodwill, exposure to potential regulatory ramifications, as well as monetary damages in an amount to be determined at trial.

**COUNT IV**
**Tortious Interference with Advantageous Business Relations**
**(Against All Defendants)**

127. Saw.com restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

128. Saw.com enjoyed business relationships and/or expectancies of business relationships with certain customers and potential customers, including those customers that possess or may possess domains marketed or sought by Saw.com's current or prospective customers.

129. The business relationships and expectancies described above had a likelihood of economic benefit to Saw.com.

130. As a result of her engagement with Saw.com and her access to Saw.com's trade secrets and Proprietary Information, Defendants had and have intimate knowledge of Saw.com's trade secrets, the business relationships and expectancies of Saw.com with their customers and potential customers, and the goodwill and reputation of Saw.com.

131. Defendants knowingly and intentionally misused Saw.com's trade secrets and Proprietary Information to solicit Saw.com's customers and potential customers to work with ProBroker for its domain marketing needs and services from Defendants, when Saw.com validly

expected those customers and potential customers to obtain such domain brokerage services from Saw.com.

132.    Defendants' intentional and unauthorized appropriation of Saw.com's trade secrets and other Proprietary Information, as well as their knowing and intentional misrepresentation of Saw.com's customer relationships and successes as their own to the market at large constitutes wrongful acts.

133.    The aforesaid acts of Defendants were inherently wrongful, and could not be justified under any circumstances.

134.    Defendants' actions have resulted in damages to Saw.com in the form of disruption of the business, business relationships, and expectancies between Saw.com and its customers and prospective customers,.

135.    Saw.com was damaged in an amount to be determined at trial, including but not limited to lost profits from diverted sales opportunities, diminished value of customer relationships, costs for remediating customer issues Defendants caused, and costs for repairing damage to Saw.com's goodwill and reputation.

**COUNT V**
**False Advertising in violation of the Lanham Act,**
**15 U.S.C. § 1125(a)**
**(Against ProBroker)**

136.    Saw.com restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

137.    Saw.com is a business engaged in domain brokerage industry, providing services to customers, including but not limited to facilitating the purchase and sale of website domains and other digital properties, representing buyers seeking to acquire specific domain names and

sellers looking to divest them, as well as domain appraisal, protection, and portfolio management services

138. Ms. Hernandez and her wholly-owned entity, ProBroker, are direct competitors of Saw.com in the same relevant market and offers, or purports to offer, services that compete directly with Saw.com's services.

139. ProBroker made and disseminated false and misleading statements of fact, including express and implied representations that: (a) ProBroker performed services for particular customers; (b) ProBroker had business relationships or accounts with those customers; and (c) those customers are "trusted" customers of ProBroker, when, in reality, those identified customers are customers of Saw.com and not customers of ProBroker.

140. In connection with the advertising and promotion of its services, ProBroker disseminated these false and or misleading statements in commercial advertising and promotion through channels in interstate commerce and including, without limitation, ProBroker's website, with the purpose and effect of influencing purchasing decisions.

141. The representations identified above are false and misleading statements of fact in commercial advertising or promotion and are material because they are likely to influence customers' decisions to obtain services, to select a domain broker, or to transfer accounts, portfolios, or relationships to ProBroker.

142. ProBroker's false and misleading statements actually deceived, or had a tendency to deceive, a substantial segment of the intended audience, including current and prospective customers in the domain market.

143.     ProBroker's statements were made willfully and with knowledge of their falsity, or with reckless disregard for the truth, as Defendants knew or should have known that the customers and successful transactions it claimed as its own were, in fact, accurately attributed to Saw.com.

144.     ProBroker's false advertising has caused, and is likely to continue causing, competitive injury to Saw.com, including diversion of sales and business opportunities, loss of prospective and existing customer relationships, harm to Saw.com's reputation and goodwill, and the need for corrective marketing and communications.

145.     Saw.com has been and will continue to be damaged by ProBroker's conduct in an amount to be proven at trial, and Saw.com has suffered and will suffer irreparable harm for which there is no adequate remedy at law absent injunctive relief.

146.     Saw.com seeks all remedies available under Section 43(a), including injunctive relief, monetary damages, disgorgement of ProBroker's profits, corrective advertising, and attorneys' fees and costs, as permitted by law and to be determined by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Saw.com respectfully requests the following relief:

    a)  Preliminary and permanent injunctive relief restraining the Defendants from:

        i.  further misappropriating or using Saw.com's trade secrets or confidential information;

        ii.  further breaching the Agreements Brooke Hernandez entered into with Saw.com, including, without limitation, soliciting Saw.com's customers or prospective customers for the duration of the Restricted Period;

        iii.  further falsely advertising customer relationships and transactions properly attributed to Saw.com;

        iv.  further exercising possession or control of Saw.com's Proprietary Information or other property; and

        v.  further tortiously interfering with Saw.com's advantageous business relationships.

b) Compensatory, consequential, and incidental, damages in an amount to be determined at trial;

c) Disgorgement of all profits earned by Defendants through their unlawful conduct;

d) Multiple damages and attorneys' fees as permitted by contract, statute, or other applicable law;

e) Punitive or exemplary damages based on Defendants' fraudulent, intentional, and malicious conduct and/or pursuant to 18 U.S.C. § 1836(b)(3)(C) and/or other applicable law;

f) Equitable tolling of the Restricted Period in the Agreement commensurate with the time during which Ms. Hernandez has failed to comply with her contractual obligations;

g) Costs and expenses otherwise recoverable under the law;

h) Pre-and post-judgment interest at the highest legal rate; and

i) Any other relief as deemed to be warranted by this Court.

## DEMAND FOR JURY TRIAL

Saw.com demands a jury trial on all issues so triable.

Respectfully Submitted,

*/s/ Erik W. Weibust*
Erik W. Weibust (BBO #663270)
Adam R.D. Paine (BBO #697246)
Epstein, Becker & Green, P.C.
One Financial Center, Suite 1520
Boston, MA 02111
Tel: (617) 603-1090
eweibust@ebglaw.com
apaine@ebglaw.com

Date: March 4, 2026                    *Counsel for Plaintiff Saw Technologies Inc.*

## VERIFICATION

I, Jeffrey Gabriel, hereby verify and certify under 28 U.S.C. §1746 as follows:

1.    I am the founder and Chief Executive Officer of Saw Technologies Inc.

2.    I have read the foregoing Verified Complaint and I verify, based on my personal knowledge and the records and information maintained by Saw Technologies Inc. d/b/a Saw.com to which I have access, that the facts stated in the Verified Complaint are true.

I certify under penalty of perjury that the foregoing is true and correct.

Jeffrey Gabriel

Date:  March 4, 2026