**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SAW TECHNOLOGIES INC. | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| v. | )  C.A. No. 1:26-cv-11124 |
| | ) |
| BROOKE HERNANDEZ and | ) |
| PROBROKER LLC | ) |
| | ) |
|       Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF SAW'S**
**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Saw Technologies Inc. ("Saw.com") hereby moves, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction enjoining Defendants Brooke Hernandez and ProBroker LLC from: (a) misappropriating Saw.com's trade secrets and confidential information; (b) breaching the post-termination restrictive covenants contained in Ms. Hernandez's Consulting Agreement (the "Agreement"), which prohibit soliciting Saw.com's customers and prospective customers during a limited six-month post-termination Restricted Period; (c) disseminating false or misleading statements attributing Saw.com's transactions or customer relationships to ProBroker in a manner that confuses the market; (d) exercising possession or control over Saw.com's confidential information and trade secrets or other property; and (e) tortiously interfering with Saw.com's advantageous business relationships.

Saw.com seeks narrowly tailored, time-limited injunctive relief to preserve the status quo and protect its trade secrets, confidential information, and goodwill during the pendency of this case. Ms. Hernandez, a former independent contractor bound by a six-month post-termination non-solicitation covenant and enduring confidentiality obligations, has launched a directly competing brokerage, ProBroker, and is using Saw.com's confidential information and trade secrets and its

customer goodwill and relationships to improperly solicit its clients and divert opportunities from Saw.com to ProBRoker Moreover, Ms. Hernandez has deleted and concealed Saw.com's company records, and has been publicly misattributing Saw.com's transactions to ProBroker to confuse the market and profit off of Saw.com's substantial investment of capital and sweat equity.

Saw.com and Ms. Hernandez entered into the Agreement to safeguard Saw.com's confidential and trade secret information, including its customer lists and contact information, leads, inventory, proposals, contracts, domain registrant information, communications, offers, pricing information, and financial data, among other things, as well as its customer relationships and goodwill. To that end, the Agreement imposes: (a) a six-month non-solicitation covenant post-termination as to Saw.com customers and prospective leads with whom she had no pre-existing relationship; (b) confidentiality and return-of-property obligations; and (c) a requirement to provide equipment for inspection to confirm deletion of Saw.com's confidential information and trade secrets. Ms. Hernandez resigned effective October 29, 2025, and launched ProBroker and immediately began competing with Saw.com by soliciting Saw.com's customers and using Saw.com's confidential information and trade secrets. Saw.com's post-resignation investigation, which remains ongoing, has already uncovered Ms. Hernandez's improper deletion of emails and other information from Saw.com's Customer Relationship Management ("CRM") database, concealed meetings and transactions, and diversion tactics designed surreptitiously to proceed outside Saw.com's systems. Further, ProBroker publicly attributes notable domain transactions and "companies worked with" to itself that are, in reality, Saw.com's transactions and relationships, creating marketplace confusion and harm to Saw.com's goodwill.

These facts establish a strong likelihood of success on the merits of Saw.com's claims for trade secret misappropriation, breach of contract, tortious interference, and false advertising, and

demonstrate the risk of irreparable harm to Saw.com's confidential information and customer goodwill absent injunctive relief. The balance of hardships favor Saw.com, and an injunction serves the public interest by enforcing contracts, protecting confidential information and trade secrets, and avoiding market confusion.

## RELEVANT FACTS[1]

### A. Saw.com Engages Brooke Hernandez as an Independent Contractor and Executes the Consulting Agreement

Saw.com is a domain brokerage firm and functions as a brokerage for digital properties, representing and connecting buyers seeking to acquire specific domain names and sellers looking to divest them. Saw.com further leverages its expertise in the domain industry to provide its customers with crucial domain brokerage, appraisal, protection, and portfolio management services. Compl. at ¶¶ 2, 28-29. Brooke Hernandez was engaged by Saw.com as an independent contractor performing domain brokerage services for Saw.com from approximately December 23, 2019 until October 29, 2025, subject to a Consulting Agreement made as of December 23, 2019 by and between Ms. Hernandez and Saw.com's predecessor, J. Matthew Inc., as Massachusetts corporation (the "Agreement"). *Id.* at ¶¶ 4-7, 32.[2] As a condition of her engagement, Ms. Hernandez agreed to obligations of confidentiality, non-use, return of Saw.com property upon separation, non-solicitation of customers and prospective customers for six months, and a Massachusetts forum provision.[3] *Id.* at ¶¶ 9, 25, 32, 42-44. Ms. Hernandez was provided substantial

---

[1] All facts herein are drawn from Saw.com's Verified Complaint ("Compl."), filed contemporaneously herewith.

[2] On January 1, 2022, Saw.com acquired all rights, assets, agreements, and good will of J. Matthew Inc. in connection with a transaction authorized by the shareholders of J. Matthew Inc. on December 20, 2021, and assumed J. Matthew Inc.'s rights and obligations under the Agreement. In an asset purchase agreement dated May 23, 2023, Saw Technologies Inc. acquired all assets of Saw.com Inc. and assumed all rights and obligations under the Agreement. *Id.* at ¶ 33.

[3] *See Inso Corp. v. Dekotec Handelsges, mbH*, 999 F. Supp. 165, 167 (D. Mass. 1998) (denying motion to dismiss for lack of personal jurisdiction and noting that assent to a forum selection provision amounts to consent to personal jurisdiction in the selected jurisdiction); *see also Leasecomm Corp. v.*

access to Saw.com's confidential information including customers, leads, inventory, proposals, contracts, domain registrant information, contact information, communications, offers, pricing information, and financial data, among other things. *Id*. at 34. Ms. Hernandez was entrusted with access to Saw.com's various databases and other tools and accounts, including Saw.com's customer relationship management ("CRM") database; Saw.com's scheduling platform; and DomainIQ, a paid service used to research domain ownership, contact information, and historical pricing and other data, similar to a registry of deeds for real property. *Id*. at ¶ 35. Ms. Hernandez's access to and use of these accounts gave her significant access to Saw.com's Proprietary Information, so, naturally, she was required to comport with Saw.com's policies and procedures, including an obligation to secure, backup, and refrain from deleting correspondence with customers and prospects and logging all interactions in Saw.com's accounts. *Id*. at ¶ 36.

At the time Ms. Hernandez began performing services for Saw.com, she relied, in large part, on the customers of Saw.com to perform services. Rather than generate customers, the vast majority of Ms. Hernandez's sales were existing Saw.com customers or prospects, or transactions Ms. Hernandez was assigned to service, maintain, and/or execute upon. *Id*. at ¶ 37. In these relationships, Ms. Hernandez managed Saw.com's established relationships and goodwill, maintained communication with Saw.com's customers, facilitated negotiations and transactions, and promoted offerings with established customers and prospective customers of Saw.com. In other words, the goodwill belongs to Saw.com, not Ms. Hernandez. *Id*. at ¶ 38.

Indeed, at the time of her resignation in October 2025, Ms. Hernandez was overseeing, involved with, or was responsible for more than 46,000 leads and 90,000 contacts, and had non-

---

*Crockett*, 1998 Mass. App. Div. 6 (Dist. Ct. 1998) (explaining Massachusetts recognizes forum selection clause are valid as the sole basis for jurisdiction over a non-resident and should be enforced unless it is demonstrably unfair or unreasonable to do so).

public information concerning approximately 360,000 leads and 620,000 contacts in Saw.com's pipeline, as well as highly confidential and commercially sensitive information relevant to Saw's customers and both completed and pending transactions, including prices, offers, valuations, and appraisals of domains and portfolios, all of which Saw.com maintains as confidential and makes accessible only to those with a genuine need to know who are subject to contractual obligations restricting their use or disclosure of such Proprietary Information outside of Saw.com. *Id.* at ¶ 39.

### B. Ms. Hernandez's Agreement with Saw.com

As a condition of her engagement with Saw.com, Ms. Hernandez agreed to a number of limited yet crucial obligations designed to protect Saw.com's substantial investment in its customer relationships, leads, and pipeline, as well as Saw.com's Proprietary Information. *Id.* at ¶ 42. Specifically, Section 7 of the Agreement provides:

> Upon termination of this Agreement Consultant shall return any company property in Consultant's possession, and continue [to] comply with the confidentiality provisions stated below and shall, for a period of six months, refrain from directly or indirectly soliciting any customer or prospective lead of the Company with whom Consultant did not have an existing relationship prior to this Agreement.[4]

In Section 9 of the Agreement, Ms. Hernandez agreed that:

> Consultant understands that during the course of preforming this Agreement, Consultant will obtain and utilize Proprietary Information of the Company. Such Proprietary Information shall include, without limitation, sale and purchase prospects, leads, inventory, proposals, contracts, domain registrant information, communications, offers, pricing information, financial data and other data which would reasonably be understood to information of value possessed, generated and used by company in the course of conducting its business and from which the Company derives commercial advantage.

> Consultant shall maintain such proprietary information as Company may direct exclusively on Company equipment….

> Consultant understands and agrees that unauthorized disclosure of Proprietary Information shall cause irreparable damage to the Company. Upon termination of this Agreement, the Consultant shall return all Company property to the company and shall retain no copies, backups or portions thereof on any media, network

---

[4] *Id.* at ¶ 43; Ex. A at Sec. 7.

storage system, or any other device or system which consultant owns or to which Consultant has access. Consultant shall, upon request of the company and at Company's expense, temporarily provide any equipment which Consultant has used in the conduct of company business or upon which Proprietary information has been stored for inspection by a third party technical services provider to confirm deletion of company's Proprietary Information from such equipment. Consultant also agrees to not solicit any Company Contractors or Employees (or any that have left in the last 90 days) for a period of 90 days from termination.[5]

## C. Extent of Ms. Hernandez's Pre- and Post-Resignation Misconduct Comes to Light

In or about 2025, Ms. Hernandez began concealing transaction details from Saw.com, including the referral sources for certain transactions and referral fees paid to third-parties. *Id*. at 48. Then, on or before September 17, 2025, Ms. Hernandez changed her email signature block to remove all Saw.com information, leaving only her personal cellphone number; in the 45 days leading up to her resignation, Ms. Hernandez sent nearly 1,000 emails to customers that included only her personal phone number and not Saw.com's contact information. *Id*. at ¶ 60.

In the course of the Parties' engagement, Ms. Hernandez was granted access to Saw.com's computer systems, networks, and accounts, including email accounts, CRM databases, meeting tracking repositories and other pricing and valuation resources, solely for Saw.com's business purposes. *Id*. at ¶ 35. In the weeks leading up to the end of her engagement, Ms. Hernandez deleted email communications with Saw.com leads, activity logs, and call logs, and on her final two days before terminating the Agreement, exported data from Saw.com's systems and deleted further call logs, contact information, and email activity. *Id*. at ¶ 65. On the day she resigned, moreover, Ms. Hernandez emailed 39 Saw.com customers using her modified signature, inquired if they intended to purchase any domains, and directed all communication to her personal phone. *Id*. at ¶ 61. Further, Ms. Hernandez inexplicably connected her Saw.com-provided email account to an

---

[5] *Id*. at ¶ 44; Ex. A at Sec. 9.

unauthorized third-party AI-powered application, exposing Saw.com's communication and Proprietary Information to potential proliferation and misuse and retention. *Id*. at ¶ 64.

Effective October 29, 2025, Ms. Hernandez terminated the Agreement, ending her engagement with Saw.com and initiating a six month prohibition against soliciting Saw.com's customers or prospects. *Id*. at ¶ 67. Saw.com has conducted an investigation analyzing Ms. Hernandez's use of her Saw.com email account, Saw.com's CRM database, and scheudling account and uncovered misconduct that Ms. Hernandez concealed from Saw.com, including her deletion of email correspondence from Saw.com's systems, deletion of leads and other company data from Saw.com's databases, and concealment of transaction details and meetings with Saw.com's customers and prospects. *Id*. at ¶¶ 68-70. In addition to her misuse, destruction, and obfuscation of Saw.com's electronic communications and other information, Ms. Hernandez leveraged her access to Saw.com's Proprietary Information, to divert transactions from Saw.com for her own personal benefit and to conceal these transactions. *Id*. at ¶ 71-73.

In or about January 2026, Ms. Hernandez formally announced the launch of ProBroker, a competing domain brokerage business. Further highlighting Ms. Hernandez's efforts to draft off the success of Saw.com, ProBroker's website falsely touts "its" successes, including acquiring various domains, and lists among "Companies We've Worked With" Signature Builders, Pin, and Cow's Milk Protein Allergy – customers offering services in Massachusetts, as well as Macromax, Wellnest, Bookmarked, Innovo, Storyboard, however, none of these "successes" can be properly attributed to ProBroker. ProBroker displays "Testimonials" on its website, implying that these customers worked with ProBroker, when again, in reality, each testimonial was submitted to Saw.com via its review site during Ms. Hernandez's engagement with Saw.com and before ProBroker was formed. *Id*. at ¶¶ 77-79. Further, several of the domains ProBroker lists for sale on

its website are owned by Saw.com customers, indicating that Ms. Hernandez has solicited their business following termination of the Agreement. For example, Holdings.ai is owned by a Saw.com customer that Ms. Hernandez did not work with prior to her engagement with Saw, yet ProBroker now identifies itself as the broker for "Holdings.ai," indicating that Ms. Hernandez has solicited the domain owner following termination of the Agreement. *Id.* at ¶ 81.

Saw.com in an extremely vulnerable position as ProBroker can easily target each of those customers and take for itself the revenue the customers would otherwise generate for Saw.com, and exploit Saw.com's legwork and investment in building the customer relationships and goodwill, particularly where Ms. Hernandez has eschewed her contractual prohibitions against contacting Saw.com's customers in the short six-month non-solicitation window. *Id.* at ¶ 83. Ms. Hernandez also possesses Saw.com's Proprietary Information sufficient to exploit for the benefit of her new entity, permitting ProBroker to benefit from the results of Saw.com's market research, customer development, and to use Saw.com's work product, misappropriated from Saw.com at no expense, to unfairly compete against it. *Id.* at ¶ 84. Given the breadth of the confidential customer and prospect information potentially misappropriated by Ms. Hernandez, and the potential threat to Saw.com's goodwill, Saw.com cannot estimate with any degree of certainty the extent of its potential damages to be incurred as a direct consequence of Ms. Hernandez's improper competition and misconduct, and accordingly, the injuries threatened by Ms. Hernandez's misconduct are irreparable. *Id.* at ¶ 85-86.

Following her separation from Saw.com, Ms. Hernandez improperly retained Saw.com's data and Proprietary Information and used that information to solicit Saw.com's existing and prospective customers in direct contravention of her non-solicitation obligations under the Agreement. *See id.* at ¶¶ 13, 64. Despite Saw.com's repeated attempts to recover the information,

Ms. Hernandez refused to surrender the information or devices where the information was stored, again, in direct contravention of her contractual obligations. Saw.com has repeatedly demanded that Ms. Hernandez comply with her contractual non-solicitation obligations, return of all company information and property, surrender of devices used to access the information, and cessation of access and use of Saw.com's Proprietary Information including customer lists and pipeline information. Ms. Hernandez has refused to comply, and ongoing access, use, solicitation, and spoliation risks persist. *See id*. at ¶¶ 19, 64.

## ARGUMENT

Rule 65 of the Federal Rules of Civil Procedure permits a Court to issue a temporary restraining order and preliminary injunction upon a showing that (1) the movant is likely to succeed on the merits of its claims; (2) the movant is likely to suffer irreparable harm if the injunction is withheld; (3) the balance of hardships weighs in the movant's favor; and (4) the injunction is in the public interest. *See Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). "Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996); *see also Harnett*, 731 F.3d at 10. Irreparable harm includes loss of customer goodwill, disclosure of confidential information and trade secrets, and the risk that damages will be difficult to measure. *See Baccarat*, 102 F.3d at, 20; *Sierra Club v. Larson*, 769 F.Supp.420, 422 (D. Mass. 1991) ("Irreparable injury is that injury for which money damages are not adequate compensation."). "When a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed." *EchoMail, Inc. v. Am. Exp. Co.*, 378 F. Supp. 2d 1, 4 (D. Mass. 2005); *see also G&L Plumbing, Inc. v. Kibbe*, 699 F.Supp.3d 96, 109 (D. Mass. 2023) (where movant demonstrates a likelihood of success on claim for trade secret misappropriation, it is entitled to a presumption of irreparable harm as a matter of law).

A. **Saw.com Is Likely To Prevail On The Merits Of Its Claims Exposing Saw.com To The Greatest Risk Of Prospective Harm**

i. Actual or Threatened Misappropriation of Trade Secrets

Under the Defend Trade Secrets Act ("DTSA"), the owner of a trade secret may bring a civil action if the trade secret relates to a product or service used in interstate or foreign commerce. *See* 18 U.S.C. §§ 1836, *et seq*. "Misappropriation" includes the use or disclosure a trade secret without consent by a person who knew or had reason to know the trade secret was acquired through improper means. *Id.* Injunctive relief is warranted to prevent actual or threatened misappropriation. *See Kibbe*, 699 F.Supp.3d at 96 (granting a preliminary injunction where the plaintiff demonstrated a reasonable likelihood of success in proving that a former employee misappropriated trade secrets regarding estimates, pricing, and customers to establish a competing).

To prevail on its claim under the DTSA, Saw.com must establish that (1) the information at issue constitutes a trade secret, (2) Saw.com took reasonable measures to secure the confidentiality of the information, and (3) the defendant "used improper means," to actually or attempt to acquire or use the trade secret. *See e.g., Parexel Int'l LLC v. Signant Health Holding Corp.*, 2023 WL 2938073, *9 (D. Mass. Apr. 13, 2023); *Kibbe*, 699 F.Supp.3d at 105 (finding plaintiff had established a likelihood of success on its trade secrets claim warranting preliminary injunction). To qualify as a trade secret, the information must be protected through reasonable means, that "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B).

For a brokerage business like Saw.com, which is built on its customer relationships, reputation, and referral sources, its existing and prospective customer relationship pipeline is its most valuable asset, and misappropriation of this information and improper poaching of these

relationships threatens its viability. Saw.com's Proprietary Information, including customer identities, sale activities, pricing, and valuations constitutes trade secrets for which Saw.com employs reasonable measures to maintain secrecy and which derive independent economic value from not being generally known. *See Allstate Ins. Co. v. Fougere*, 2019 WL 4776986, at *21 (D. Mass. Sept. 30, 2019) ("Customer lists are expressly recognized as being a type of compilation of information that can qualify as a trade secret."); *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 239 (D. Mass. 2011) (finding plaintiff showed a likelihood of success warranting issuance of preliminary injunction after determining that plaintiff was likely to establish that customer list was a trade secret); *Signant Health*, 2023 WL 2938073, at *8 (noting that customer lists and related information and account strategies regarding customers as potentially trade secret information).

Saw.com takes reasonable measures to maintain the secrecy of its trade secret information. *See* Compl. at ¶¶ 87-96. Saw.com restricts access to its trade secret and confidential information only to those working with Saw.com with a genuine need to use the information and by housing the data in secure accounts and databases. Saw.com restricts access to its computer systems by maintaining computer security systems and requiring password and two-factor. Saw.com contractors are required to maintain the confidentiality of all Saw.com's trade secrets, confidential, and proprietary information both during and after engagement with Saw.com, and use such information only in the performance of services for Saw.com. Saw.com contractors are similarly prohibited from copying or removing Saw.com Proprietary Information except in the pursuit of Saw.com business, are required to return – and are prohibited from retaining – Saw.com's information or property upon their termination. *See id.*

The Agreement further demonstrates Saw.com's measures to safeguard its trade secrets without imposing excessive restrictions on its independent contractors. Specifically, Section 7 of

the Agreement provides that, "[u]pon termination of this Agreement Consultant … shall, for a period of six months, refrain from directly or indirectly soliciting any customer or prospective lead of the Company with whom Consultant did not have an existing relationship prior to this Agreement." Saw.com does not purport to restrict Ms. Hernandez from soliciting contacts with whom she worked prior to joining Saw.com; rather, the Agreement ensures that Saw.com's originally-developed customers and leads remain shielded, for a brief six-month window, from exploitation from a departing contractor.

Ms. Hernandez had access to Saw.com's email accounts that stored client email communications and other client information, including client names, nonpublic contact information, portfolio and negotiation information, and other confidential financial information that Saw.com has expended significant resources developing. Hernandez had access to this information via Saw.com's systems and was obligated not to use or disclose it except for Saw.com's benefit. After Ms. Hernandez's resignation, Defendants used or threatened to use Saw.com's trade secrets to solicit Saw.com's customers and divert transactions for ProBroker. These facts support acquisition, use, disclosure by improper means and continued possession of trade secrets in violation of the DTSA.

Leading up to her separation from Saw.com, with every intent to launch her own competing business, Ms. Hernandez leveraged her access to non-public information regarding potential transactions, altered or omitted information from Saw.com's CRM databases, diverted the information for her own purposes, and retained Saw.com's customer information for the purposes of contacting customers and prospects. By doing so, Ms. Hernandez and ProBroker are actively using Saw.com's confidential and trade secret information to purloin Saw.com's customers for Defendants' benefit. Accordingly, Saw.com is highly likely to succeed on its claim under the

DTSA. *See DraftKings Inc. v. Hermalyn*, 732 F.Supp.3d 84, 115 (D. Mass.), *aff'd*, 118 F.4th 416 (1st Cir. 2024).

ii.  <u>Breach of Contract</u>

Saw.com is likely to succeed on its breach of contract claim as well. To prove a breach of contract, Saw.com must show that there was a valid contract, that Ms. Hernandez breached it, and Saw.com sustained injury as a result. *See Linton v. N.Y. Life Ins. Corp.*, 392 F.Supp.2d 39, 41 (D. Mass. 2005). Ms. Hernandez and Saw.com, via its predecessor-in-interest, entered into the Agreement as of December 23, 2019, under which Saw.com engaged Ms. Hernandez as an independent contractor and agreed to pay her a minimum monthly commission as well as other benefits. In exchange, Ms. Hernandez agreed to maintain the confidentiality of Saw.com's Proprietary Information and to refrain from soliciting Saw.com's customers and prospects within six months of terminating the Agreement. Ms. Hernandez breached the Agreement by soliciting Saw.com's customers and prospects immediately upon terminating the Agreement, if not before, and by refusing to surrender her electronic equipment and permitting Saw.com to confirm that no Proprietary Information had been improperly retained.

"An employer may enforce a ... non-solicitation agreement against a former employee only to the extent necessary to protect its legitimate business interests—which include guarding against the release or use of trade secrets or other confidential information, or harm to the employer's goodwill, but do not include merely avoiding lawful competition." *Robert Half Intl., Inc. v. Simon*, 2020 WL 1218988 (Mass. Super. Jan. 29, 2020) (concluding that plaintiff entitled to entry of a preliminary injunction that enforces the non-solicitation covenant by barring defendants from soliciting customers with whom they had personally worked with while at plaintiff during the twelve-month period agreed to by contract).

Under Massachusetts law, contractual covenants barring employees from competing with their employer or soliciting the employer's customers are enforceable to the extent they are consistent with the public interest and consonant with public policy. *Automile Holdings, LLC v. McGovern*, 483 Mass. 797, 808 (2020) ("a restrictive covenant is only reasonable, and thus enforceable, if it is (1) necessary to protect a legitimate business interest, (2) reasonably limited in time and space, and (3) consonant with the public interest"). "[T]he legitimate business interests that may be protected consist of trade secrets, confidential information, and good will." *Id.*, at 810. Ms. Hernandez abused her access to Saw.com's trade secrets, confidential information, and goodwill by leveraging the fog and confusion she created to divert customers to her new business, ProBroker, using Saw.com's confidential information to solicit customers, and finally, by trading on ProBroker's history and reputation by claiming credit, through ProBroker, of successes and noteworthy transactions that were properly attributable to Saw.com.

Accordingly, Saw.com is highly likely to succeed on its breach of contract claim and preliminary injunctive relief is warranted to prevent Saw.com from suffering further harm and Defendants from unjustly profiting from Ms. Hernandez's willful breaches.

iii.   Tortious Interference with Advantageous Business Relations

A claim of interference with an advantageous business relationship requires a showing that: (1) the plaintiff had a known, advantageous relationship with a third party; (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. *Hamann v. Carpenter*, 937 F.3d 86, 93 (1st Cir. 2019) (quoting *Blackstone v. Cashman*, 448 Mass. 255, 260 (2007)). "An advantageous business relationship is an existing business relationship or contemplated business relationship with

probable economic benefit." *Sensitech, Inc. v. LimeStone FZE*, 581 F.Supp.3d 342, 348–49 (D. Mass. 2022). As a domain brokerage company, Saw.com provides domain valuation services, represents both buyers and sellers in domain acquisitions, and negotiates high-value or premium domain transactions. Saw.com conduct business by identifying owners and connecting them with prospective buyers, determining market value, managing negotiations, and securely transferring ownership. Accomplishing this process effectively requires Saw.com to maintain frequent contact with portfolio holders and prospective buyers and manage and track negotiation progress, process for which Saw.com utilizes its CRM database and email communications to correspond with customers, leads, and referral sources.

Beginning in approximately August 2025, Ms. Hernandez began deleting communications, erasing data from Saw.com's CRM databases, and in at least one instance, removing an existing Saw.com customer from Saw.com's messaging list, preventing Saw.com from contacting this customer with marketing correspondence. These actions hindered Saw.com's ability to track the status of several of its customers' needs and positions as well as the status of various transactions in the pipeline. By exploiting Saw.com's trade secret information including customer lists, leads, pricing and valuation information, soliciting Saw.com's customers in direct contravention of Ms. Hernandez's contractual obligations, and falsely representing Saw.com's customers and successful transactions as precipitated by ProBroker, discussed further below, Defendants are acting with improper means to disrupt and divert Saw.com's advantageous business relationships with its existing and prospective customers, conduct that must be enjoined.

iv.  <u>False Advertising in violation of the Lanham Act</u>

Central to this case are ProBroker's false and misleading statements on its website that take credit for Saw.com's successes. In order to prove a false advertising claim, a plaintiff must prove

(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product or service; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products. *Riverdale Mills Corp. v. Cavatorta N. Am., Inc*., 146 F.Supp.3d 356, 361 (D. Mass. 2015).

ProBroker's website claims it effectuated successful services for various domains and customers, including the acquisitions of gate.com, hosting.com, spill.com, diamond.com, jumba.com, easylaser.co.uk, manifestlaw.com, macromax.com, day.ai, ollie.com, and bunny.com, and closed transactions for Signature Builders, Pin, Macromax, Wellnest, Bookmarked, Innovo, Storyboard, and Cow's Milk Protein Allergy. In reality, none of these "successes" can be properly attributed to ProBroker, as each and every deal listed or referenced was not "ProBroker's" deal, and rather, was sourced, supported, serviced, and closed when each was a customer of Saw.com.

ProBroker showcases transactions and customers as if ProBroker serviced the transactions, leading customers to believe it has a proven track record of success and a pool of customers, when, in reality, Saw.com procured these customers through referrals, marketing, or other sources, supported the valuation of the domains, and managed the negotiation of the deals. These are Saw.com successes and customers, yet ProBroker is trading on these false credentials for the purpose of attracting new customers. Representing on its website that these transactions were accomplished by ProBroker is literally false and creates a substantial risk that customers in the marketplace seeking domain brokerage services will be lured by this fictitious record of success,

believing, mistakenly, that ProBroker possesses the customer network and track record portrayed on its website that will facilitate successful transactions. A brokerage's track record, reputation, and customer relationships are its key differentiators from its competition, and by commandeering Saw.com's track record as its own, ProBroker is attempting to profit from a reputation it did not earn, at the expense of the company that did. *See Riverdale Mills,* 146 F.Supp.3d at 361.

### B. Saw.com Will Suffer Immediate and Irreparable Harm If Defendants Are Not Enjoined from Further Violations

Absent injunctive relief, Saw.com will suffer substantial and irreparable harm, as Defendants have created a significant and plausible threat that Saw.com's customers may defect as a product of Defendants' misappropriating of Saw.com's trade secrets and tortious interference, Ms. Hernandez's contractual breaches, and ProBroker's false advertising claiming credit for Saw.com's commercial history. Damages associated with any customer defections may escape accurate measurement where such defections affect Saw.com's goodwill and potential referral sources, given the significance of repeat referrals and relationships to domain brokerages, an industry where reputation, customer pools, and track record are key differentiators between competitors. *See Optos,* 777 F. Supp. at 241; *Boch Enters., Inc. v. Downing*, 1996 WL 1250623, at *1 (Mass. Super. Ct. Mar. 6, 1996).

Defendants' actions risk undermining Saw.com's business relationships with its customers and erode Saw.com's market share by diverting relationships cultivated by Saw.com. *See Optos*, 777 F. Supp. 2d at 241 (holding that undermining business relationships and market share "are precisely the types of claims that have been found to independently buttress the legal presumption of harm in trade secrets cases" and noting that injunctive relief is necessary even if movant does not identify a specific customer who has left its service for the misappropriating party); *Schawbel Corp. v. Conair Corp*., 122 F. Supp. 2d 71, 83–84 (D. Mass. 2000), *aff'd*, 15 F. App'x 800 (Fed.

Cir. 2001) ("apart from the presumption of irreparable harm, the loss of market share and business relationships due to infringement may independently constitute irreparable harm"). Irreparable harm includes loss of customer goodwill, diversion of business and disclosure of trade secrets or confidential information. Money damages cannot remedy the continuing dissemination of confidential information or the loss of competitive advantage. *See F.H. Cann & Assocs., Inc. v. Moorman*, 605 F. Supp. 3d 232, 242 (D. Mass. 2022) (irreparable harm found warranting injunctive relief where plaintiffs face a risk of permanent damage to goodwill); *Baccarat*, 102 F.3d at 18 ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable.").

Despite the limited duration of the non-solicitation restrictions, Ms. Hernandez could not wait until the ink was dry on her termination of the Agreement before soliciting Saw.com's customers and leads. In fact, she had been setting up her ProBroker business for months leading up to the termination, lining up customers transactions to take with her and concealing her efforts from Saw.com by deleting and disrupting Saw.com's electronic communications and the integrity of its CRM records. Unless and until the Court intervenes to preserve the status quo and ensure Saw.com's ability to secure its trade secret information, customer relationships, and goodwill— harms that cannot be reconciled through monetary damages alone—Saw.com remains exposed to substantial risk of irreparable loss of its confidential information and goodwill. *See Baccarat*, 102 F.3d at 18 (showing irreparable harm It is usually enough if the plaintiff shows that its legal remedies are inadequate).

Finally, even if Saw.com could not establish a likelihood of irreparable harm, which it plainly can, injunctive relief is still warranted here in light of the parties' Agreement, which expressly provides for injunctive relief. *See Washington Tr. Advisors, Inc. v. Arnold*, 646

F.Supp.3d 210, 220 (D. Mass. 2022) ("Massachusetts courts, including this Court, have generally enforced these irreparable harm clauses" and entered preliminary injunctive relief). Ms. Hernandez's Agreement recognizes that unauthorized disclosure of Proprietary Information causes irreparable damage, and Saw.com cannot quantify with certainty the scope of harm from Defendants' misuse of confidential customer and pricing information, diversion of goodwill, and market confusion. Defendants' continued access to and use of customer lists, prospect pipelines, pricing, negotiation history, and deal data enables targeted poaching and undermines Saw.com's competitive position in ways not readily remediable by damages. When a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed. *EchoMail*, 378 F. Supp. at 1, 4 . That presumption applies here. *SpeeDee Worldwide, LLC v. Toppa*, 2024 WL 1558386, at *4 (D. Mass. Apr. 10, 2024).

### C. The Balance of the Harms Weighs Decidedly in Saw.com's Favor and the Public Interest Favors an Injunction Against Ms. Hernandez

The balance of harms weighs in favor of issuing an injunction. The requested injunction is narrowly tailored and seeks only to enforce the terms of the parties' Agreement and ensure the preservation of Saw.com's trade secret information. *See Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010) ("status quo may be determined by looking at the last uncontested status which preceded the pending controversy"). The requested injunction maintains the status quo, protects property rights, and prevents unlawful conduct. It imposes no undue burden on Defendants beyond requiring compliance with existing legal obligations and the Agreement and unquestionably outweighed by the risk to Saw.com's business.

The requested injunctive relief will not harm the public interest. As demonstrated by the enactment of the DTSA, it is in the public interest to prevent misappropriation of trade secrets and to preclude bad actors from profiting from their misconduct, contractual breaches, and false

advertising. It is further in the public interest to uphold agreements in which one party agrees to refrain from soliciting customers and prospects with whom they had no prior connection for a reasonable six-month window. *See Dunkin' Donuts Franchised Rests. LLC v. Wometco Donas Inc.*, 53 F. Supp. 3d 221, 232 (D. Mass. 2014) (concluding injunction served public interest as "defendants should not be rewarded for their seemingly bald-faced refusal" to honor obligations); *see, e.g.*, *Covidien LP v. Esch*, 229 F. Supp. 3d 94, 99 (D. Mass. 2017) ("enforcing contractual provisions, including non-disclosure provisions which are at issue here, typically benefits the public interest"). Requiring Ms. Hernandez to comply with her contractual obligations, return Saw.com's information, surrender equipment containing Saw.com's data, and refrain from using or disclosing Saw.com's trade secret information advances the public interest because it encourages adherence to contractual obligations and statutory enactments. Enjoining Ms. Hernandez's violative conduct will therefore not disserve the public interest in any way.

## <u>CONCLUSION</u>

For the foregoing reasons, Saw.com respectfully requests that the Court GRANT this Motion and enter the preliminary injunction in the form requested above, together with such other and further relief as the Court deems just and proper.

Respectfully Submitted,

*/s/ Erik W. Weibust*
Erik W. Weibust (BBO #663270)
Adam R.D. Paine (BBO #697246)
Epstein, Becker & Green, P.C.
One Financial Center, Suite 1520
Boston, MA 02111
Tel: (617) 603-1090
eweibust@ebglaw.com
apaine@ebglaw.com

Date: March 4, 2026                    *Counsel for Plaintiff Saw Technologies Inc.*